## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HAYNES INTERNATIONAL, INC.,** | ) |
| **a Delaware Corporation,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | )     **Civ. No. 04-197E** |
| | ) |
| **ELECTRALLOY, a Division of G.O.** | ) |
| **Carlson, Inc.,** | ) |
| **a Pennsylvania Corporation,** | ) |
| | ) |
| **Defendant** | ) |

## OPINION

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment to Count 1

For Federal Trademark Infringement and Count 2 for Unfair Competition and False Designation

of Origin [Doc. #16] and Defendant's Motion for Summary Judgment [Doc. #17]. For the

reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is denied,[1] and

Defendant's Motion for Summary Judgment is granted only as to Plaintiff's request for

injunctive relief under federal trademark dilution law, and is otherwise denied.

Plaintiff Haynes International, Inc. ("Haynes") manufactures specialty nickel based and

cobalt based alloys, including corrosion resistant alloys. Declaration of Paul Manning ("First

---

[1] Haynes also contends that although it never actually moved for summary judgment to be granted in its favor with respect to Count III of its Complaint, that because Electralloy correctly states that the law applicable for common law unfair competition and false designation of origin claims is the same as for federal unfair competition and false designation of origin claims, it should be entitled to summary judgment on Count III of its Complaint for the same reasons that it is entitled to summary judgment with respect to Count II of its Complaint. *Assuming arguendo* the correctness of Haynes' argument, Plaintiff is not entitled to summary judgment on Count III of its Complaint for the same reason that it is not entitled to summary judgment on Count II of its Complaint.

Manning Declaration"), ¶¶ 4-5. Defendant Electralloy is a custom melter that produces steel and nickel alloys to customers' and industry specifications. Deposition of Wayne Weaver ("Weaver deposition"), p. 4.

Haynes filed a 5-count Complaint against Electralloy [Doc. #1]. In the Complaint, Haynes alleged that "[t]his is an action for infringement of United States Trademark Registration No. 1,953,864 for the trademark 'C-22', arising under § 32 of the Lanham Act, 15 U.S.C. § 1114; for false designation of origin and unfair competition arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); for federal trademark dilution arising under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); for Pennsylvania state trademark dilution arising under 54 Pa.C.S.A. § 1124; and for unfair competition under the common law of the Commonwealth of Pennsylvania." Complaint, ¶ 1. Electralloy answered and filed a counterclaim against Haynes, requesting a declaratory judgment of non-infringement of Haynes' trademark. Defendant Electralloy's Answer, Counterclaim and Affirmative Defenses to Plaintiff's Complaint, ¶¶ 30-39. At the close of discovery, Haynes filed a Motion for Partial Summary Judgment, moving the Court "for an Order granting partial summary judgment in favor of Haynes on Counts 1 and 2 asserted in this action, finding that Defendant's use of C22, EC22 and GOC22 infringe Haynes' United States Trademark Registration No. 1,953,864 for 'C-22', and further that Defendant's use of C22, EC22 and GOC22 in connection with the sale of alloy products constitutes unfair competition and false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." Plaintiff's Motion for Partial Summary Judgment, p. 1. Contemporaneously, Electralloy filed its Motion for Summary Judgment, contending that it is entitled to summary judgment on all claims brought against it by Haynes because: (1) "[a]s a matter of law, Plaintiff's alleged mark, C-22, is generic

2

and unprotectable because it is the common descriptive term used in the specialty metals industry for a grade or type of corrosion-resistant alloy meeting industry specification - UNS N06022 and containing approximately 22% chromium;" (2) "[a]s a matter of law, there is no likelihood of confusion;" and (3) "[a]s a matter of law, Plaintiff's dilution claims are completely unfounded given that C-22 is not famous and there has been no actual dilution." Defendant's Motion for Summary Judgment, p. 1.

## I. Standard of Review.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, fail to demonstrate a genuine issue of material fact and thus, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct 2548 (1986). The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. Id. at 324. In deciding a motion for summary judgment, the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor. Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).

3

## II. Relevant Facts.

Following is a summary of the facts of record relevant to the parties' cross-motions for summary judgment.[2]

### A. Evidence of record relevant to Haynes and its C-22® alloy.

The industries that Plaintiff Haynes serves include the aerospace, land-based gas turbine, heat treatment, waste treatment/environmental, chemical process, flue gas desulfurization, and automotive industries. Deposition of Paul Manning ("Manning deposition"), p. 28. In the late 1970's Haynes developed an alloy which they designated as C-22 alloy. Id. at ¶ 6. Haynes' C-22 alloy has a nominal composition of 56% nickel, 22% chromium, 13% molybdenum, 3% iron, 3% tungsten, 2.5 % cobalt and minor amounts of other alloying elements. Id. U.S. Patent No. 4,533,414 was issued to Haynes for this alloy on August 6, 1983. Id.

The metals industry has developed a numbering system known as the Unified Numbering System, or UNS, under which metal alloys can be classified according to their nominal

---

[2]By Memorandum Order dated September 2, 2008 [Doc. # 74], we denied Defendant's three motions to strike three declarations from Paul Manning, Haynes' Director of Marketing, submitted by Plaintiff in support of its motion for partial summary judgment and in opposition to Defendant's motion for summary judgment. In so doing, we explained that "we decline to add an extra layer of analysis to our resolution of the motions for summary judgment by conducting a separate paragraph-by-paragraph analysis of the three Manning Declarations." Rather, we concluded, "where Plaintiff has cited to a statement in a Manning Declaration as support either for its motion for partial summary judgment or its opposition to Defendant's motion for summary judgment, if it is necessary to a resolution of the summary judgment motions to determine whether such statement comports with the requirements of Fed.R.Civ.P. 56(e), then the Court will do so within the body of its opinion on the motions for summary judgment." Consistent with this previous order, throughout this Opinion there are instances where we have determined that a "fact" submitted by Plaintiff in support of its motion for partial summary judgment and/or in opposition to Defendant's motion for summary judgment, is not admissible under Fed.R.Civ.P. 56(e). Where we have not so held, it is to be implied that we found the evidence submitted by Haynes to have met all of the requirements of Fed.R.Civ.P. 56(e).

compositions. First Manning Declaration, ¶ 7. Haynes' C-22 alloy falls within UNS No. N06022. Id.

Haynes first sold its C-22 alloy in 1984 as "Haynes Developmental Alloy C-22" in wire form to repair welds on a bleach plant mixer. Id. Since then, Haynes has sold its C-22 alloy in the form of sheet, plate, wire, bar, tubing, piping, coated electrodes, and welding filler material such as welding rod. Id. This alloy is resistant to a variety of industrial chemicals; therefore, the alloy has been fabricated into a variety of components for chemical and pharmaceutical processing equipment, as well as equipment used in flue gas desulphurization and waste processing. Id.

Shortly after Haynes' introduction of its C-22 alloy in 1984, 39 judges from the chemical industry, chosen by "Chemical Processing Magazine," awarded Plaintiff's C-22 alloy an industry award, the "Vaaler Award;" the selection was based upon the perceived potential of this alloy for contributing to efficient and effective operation of chemical processing plants. Third Declaration of Paul Manning ("Third Manning Declaration"), ¶ 5.

In 1996, Haynes registered "C-22" as a trademark for "unwrought and partially wrought common metals and their alloys in various forms including sheet, plate, wire, bar, billet, tubing, piping, coated electrodes, fittings, and welding filler material and castings" under United States Trademark Registration No. 1,953,864. First Declaration of Paul Manning ("First Manning Declaration"), ¶ 8; Third Manning Declaration, ¶ 13. Haynes filed affidavits under §§ 8 and 15 of the Lanham Act, which were accepted and acknowledged by the United States Patent and Trademark Office. Third Manning Declaration, ¶ 13.

5

Since its introduction in 1984, Haynes has advertised and promoted its C-22 alloy in brochures, industry publications, on its website, and at approximately 6 to 8 trade shows per year. First Manning Declaration, ¶ 9. Additionally, more than 25 technical papers have been written by Haynes employees that describe uses of and tests conducted on Plaintiff's C-22 alloy. Id. Haynes distributes these technical papers at various trade shows. Id.

Haynes manufactures a number of alloy products. The average of Haynes' annual advertising and marketing expenses for 36 of its alloys between 1999 and 2005 was $1,440,000. Id. at ¶ 15. Most of Haynes' marketing efforts involve marketing more than one of its alloys and most of its marketing efforts include its C-22 alloy. Id. Haynes spends approximately $10,000 annually to create print brochures for its C-22 product. Third Manning Declaration, ¶ 14.

During the years 1995 through 2005, Haynes' average yearly worldwide sales of its C-22 alloy was approximately $ 22.8 million. First Manning Declaration, ¶ 9. Its average yearly sales of its C-22 alloy to customers in the United States during this same time period was approximately $10 million. Id. Between 1999 and 2005, C-22 was one of the top 10 grossing alloys of Haynes' 36 alloys. Second Manning Declaration, ¶ 2; Third Manning Declaration ¶ 15.

Haynes sells to a variety of different consumers which purchase in different quantities. First Manning Declaration, ¶ 10. For example, Haynes sells mill quantities to consumers which purchase in large volumes of 650 pounds or more. Id. Haynes also sells to service centers which will sell the alloy in lesser amounts. Id. Haynes also sells to fabricators and resellers. Id. A fabricator will form the C-22 alloy into a product or into parts that are assembled with other parts to form a product, and sell the product to an end user. Id. Haynes will sell larger quantities of its C-22 alloy to resellers which then sell it in small quantities. Third Manning Declaration, ¶

6

20. Manning explained that based upon discussions with resellers and other customers, visits to their locations and observations of customers which have purchased Haynes' C-22 alloy, that the degree of care exercised by customers often depends upon the price of the alloy which is dictated by the amount purchased. Id.

Haynes permits its fabricator and reseller customers to use Haynes' trademarks when advertising their products. First Manning Declaration, ¶ 11. If Haynes discovers that a third party is misusing C-22 for products not made by Haynes, then Haynes will notify the third party of the infraction and demand correction. Id. Thus, when Haynes became aware in July 2003 that Electralloy was using products named C22 and EC22 on its website, Haynes sent Electralloy a cease and desist letter. Id. at ¶ 12.

Further, when Haynes was provided information from Electralloy that a number of the third parties were using "C-22" or a version of C-22, Haynes sent out "cease and desist" letters to twelve purchasers (i.e., consumers) of its C-22 alloy (Fast Alloys, National Specialty Alloys, Inc., Cbol Corporation, Corrosion Materials, Instrument Associates, Inc., Fisher-Rosemount/ Emerson, High Performance Alloys, Inc., J.M. Canty, Inc., Newman Flange, Oxford Alloys, Inc., Penn Machine, and TW Metals); one possible customer (Bartalini Comm.Agt), and two competitors in April 2005 and September 2005 (Allegheny Technologies, for misuse by ATI Allvac, an operating company of Allegheny Technologies, and Marphil, International).[3] See Exhibit L attached to the Second Declaration of Paul Manning. In these letters, Haynes stated to

---

[3]Hereinafter the Court will refer to the cease and desist letters sent out by Haynes and the responses received by Haynes in response to these letters collectively as "the Cease and Desist Correspondence."

the addressee of each letter that it either was misusing its C-22 trademark (competitors) or not properly referring to C-22 as a registered trademark of Haynes (customers) and asked the addressee to correct its website, publication(s), and other material either by discontinuing the use of the term C-22 or by indicating that C-22 is a trademark of Haynes. Id. The letters were sent out in April and September 2005. Id.

More specifically, with respect to competitors to which Haynes sent cease and desist letters, on a website page dated February 17, 2005, ATI Allvac, an operating company of Allegheny Technologies, a competitor of Haynes, listed an alloy it sold as "Nickelvac®C22 (UNS-N06022)." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 23; Second Manning Declaration, Exhibit L. Upon being contacted by Haynes, Allvac changed the name of its alloy from "Nickelvac®C22 (UNS-N06022)" to "Nickelvac 22." Id. Allegheny Technologies also told Haynes "ATI Allvac's use on its web pages [of C-22] was in advertent and unintentional." Id.

Marphil, a French company and another competitor of Haynes, had been using the term C22 as one it its nickel alloys. Id. Upon being contacted by Haynes, Marphil agreed "to suppress 'C' in the mention of the alloy 22 supplied by Marphil International." Id. Marphil also stated: "[w]e know about 'Hastelloy' being a registered trademark of Haynes International Inc. and therefor never use it in the description of our alloy-22 products as they originate from different manufacturers. We did not know about 'C-22.' Please accept our apologies."

Other competitors of Haynes with respect to its C-22 alloy include Special Metals, which uses the designation "622" for its equivalent product and Krupp VDM, which uses the designation "NICRMO" for its equivalent product. Manning deposition, pp. 95-98. Additionally,

8

Arcos, which sells welding rod within UNS N06022 from alloy purchased from manufacturers other than Haynes, uses the designation "Arcos Alloy 22" for its equivalent product. Second Manning Declaration, ¶ 4.

With respect to its customers to whom Haynes sent cease and desist letters, on a website page dated November 11, 2004, Fast Alloys, a Haynes customer, had listed under "Plate Stock Range" "ALLOY C22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 22. Upon being contacted by Haynes, Fast Alloys changed the website page to indicate that it sold Alloy C22® and that C-22 was a registered trademark of Haynes. Second Manning Declaration, Exhibit L.

Corrosion Material, a Haynes customer, had created a list of "Common Trade Names; " listed under "Common Trade Names" for a Ni-Cr-Mo Alloy was "Alloy C22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 4. The list also stated that the following companies manufactured alloy products that met the specification of UNS N06022 and listed the name of the manufacturer's alloy product: (1) VDM – Nicrofer® 5621hMoW; (2) Special Metals – Inconel® Alloy 22; (3) Cartech – Carpenter Alloy 22; (4) Allvac – Nickelvac® C22; (5) Allegheny - AL 22; (6) Forini - AF.C22; (7) Haynes – Haynes® C-22 Alloy; and (8) Bohler – L328. Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 4.

In addition to its list, Corrosion Materials also had described an alloy product it had available as "Alloy C-22/UNS NO6022," a "a nickel-chronium-molybdenum alloy" and printed a brochure about "Alloy C-22." Id., Exhibits 16 and 20. Upon being informed by Haynes that it was not properly indicating on its literature that C-22 was a registered trademark of Haynes,

9

Corrosion Material informed Haynes that it had "removed the Hastelloy® C-276 and C-22®

brochures from all areas that might result in an inadvertent distribution and they would be

destroyed. Second Manning Declaration, Exhibit L. "We have been in the process of removing

the offending trademarks as brochures were depleted, but will accelerate that process." Id.

Corrosion Materials further explained: "[w]hile we do continue to stock and sell . . . Hastelloy®

C-22®, we do indeed stock materials from other manufacturers. We never misrepresented our

stock offering and always advise any customer specifying Hastelloy® that we are offering an

alternate to Hastelloy when that is the case." Id.

A 1987 technical monograph from Fisher-Rosemount Systems/Emerson, a Haynes

customer, had listed "C22, Alloy" as the "Common/Tradename/Other Designation" for N06022

Nickel Alloy. Defendant's Concise Statement of Material Facts in Support of Summary

Judgment, Exhibit 5. While 1987 was prior to the time Haynes received a trademark for C-22,

the monograph was available on Fisher-Rosemount/Emerson's website in 2005. Second Manning

Declaration, Exhibit L. Upon being informed that two Haynes registered trademarks were not

properly identified in the monograph, including C-22, Fisher-Rosemount/Emerson acknowledged

that the two trademarks were not identified correctly, agreed to remove the monograph from its

web pages, and ceased all distribution of the monograph. Id.

Oxford Alloys, Inc., a Haynes customer, had listed "Alloy C-22" under Nickel Alloys it

had available for sale. Defendant's Concise Statement of Material Facts in Support of Summary

Judgment, Exhibit 19. Haynes contacted Oxford Alloys to inform it that on several pages of

Oxford Alloys' website, it was using several of Haynes' registered trademarks, including its C-22

trademark, incorrectly. Second Manning Declaration, Exhibit L. Upon being contacted by

10

Haynes, Oxford Alloys began to make Haynes' requested changes to the website, and "apologize[d] for the misunderstanding related to the trademark use. We have noted your requirements in our internal records and will be diligent in our future use of the Haynes trademark." Id.

On an undated page from its website Newman Flange, a Haynes customer, had listed under "Materials Available for Quoting" "ALLOY C22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 21. Haynes contacted Newman Flange and told them that while they could use the Haynes trademarks in conjunction with the sale of products that it purchased from Haynes, "any use of Haynes' trademarks should indicate that the trademarks you use are trademarks of Haynes International." Second Manning Declaration, Exhibit L. In response, Newman Flange began listing that it had available for quoting "Alloy C-22®" and further explained on the website that "C-22 is a registered trademark of Haynes International." Id.

In its literature, TW Metals, a Haynes customer, stated that it stocked pipe that met grade "C-22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 25. Haynes contacted TW Metals and told them that while they could use the Haynes trademarks in conjunction with the sale of products that it purchased from Haynes, "any use of Haynes' trademarks should indicate that the trademarks you use are trademarks of Haynes International." Second Manning Declaration, Exhibit L. In response, TW Metals removed the C-22 product from its website and brochures. Id.

A page from the website of Cbol Corporation, a Haynes customer, dated March 10, 2005, lists for sale tubing made from C-22. Defendant's Concise Statement of Material Facts in

11

Support of Summary Judgment, Exhibit 27. Haynes contacted Cbol Corporation and told it that while it could use Haynes trademarks in conjunction with the sale of products that it purchased from Haynes, "any use of Haynes' trademarks should indicate that the trademarks you use are trademarks of Haynes International." Second Manning Declaration, Exhibit L. In response, Cbol stated "[w]ith regard to your trademark request for the product C22, we are currently in the process of creating a new website. Therefore, the page . . . which refers to C-22 as one of the Nickel Alloys in our product line, has been removed from the website entirely." Id.

On a website page dated March 10, 2005, Penn Machines, a Haynes customer, had a "Nickel Alloy Material Grade Composition Chart." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 37. The name of one alloy on the chart was C22; C22 was listed as meeting N06022 and having a grade of AC22. Id. Penn Machines also listed "C22 (N06022)" under "Nickel Alloys" it had available for sale. Id. Haynes contacted Penn Machines and told it that while it could use Haynes trademarks in conjunction with the sale of products that it purchased from Haynes, "any use of Haynes' trademarks should indicate that the trademarks you use are trademarks of Haynes International." Second Manning Declaration, Exhibit L. In response, Penn Machine added an asterisk to its material that indicated that C-22 was a trademark of Haynes. Id. Penn Machine also apologized and stated "we were not aware that 'C-22' was a registered trademark of Haynes International, Inc." and "I . . . assure you that this was not intentional not to have them listed." Id.

An undated website page from HPAlloys, a Haynes customer, lists "HASTELLOY® Alloy C-22. Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 17. Haynes contacted HP Alloys and told it that while it could use Haynes trademarks in

12

conjunction with the sale of products that it purchased from Haynes, "any use of Haynes' trademarks should indicate that the trademarks you use are trademarks of Haynes International." Second Manning Declaration, Exhibit L. In response, HP Alloys indicated that it had initiated a program to make the necessary changes. Id.

Not all Haynes' customers agreed to make the requested change to their literature when presented with a cease and desist letter from Haynes. In describing a Quick Change Rupture Disk Holder it manufactured, J.M. Canty, Inc., a Haynes customer, discussed in an undated document, "C22-Alloy C22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 24. Haynes contacted J.M. Canty about this document. Second Manning Declaration, Exhibit L. J.M. Canty, Inc. refused to stop using "C22" to refer to the alloy products it sold that met the specifications of UNS N06022 on the basis that Haynes was not its only supplier of the alloy and "[w]e use the industry accepted name C22 in our literature." Id. Haynes has sued J.M Canty, Inc. for trademark infringement related to its C-22 trademark.[4]

Additionally, a website from Alibaba.com seemed to indicate that Bartalini Francesco Comm.Agt, an Italian company, sold pipes made from Alloy "C-22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 26. Haynes lists Bartalini Comm. Agt. as a possible customer. Second Manning Declaration, Exhibit L. Haynes sent a cease and desist letter to Bartalini in Italy, but never received a response. Id.

Haynes also acquired a Firth Rixson specification sheet from a Firth Rixson booth at an "expo" a few days prior to June 17, 2005; the specification sheet indicated that it had available

---

[4]Haynes had also sued Jessop Steel in 1987 for infringement of its patent on C-22. Manning deposition, p. 124.

13

alloy "C22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 43. Haynes contacted counsel for Firth Rixson in June 2005 and stated "[t]he use of 'C22' by your client constitutes infringement of our Registration No. 1,953,864 for C-22. We, therefore, demand that Firth Rixson immediately cease and desist from the use of C-22 for alloy products. Furthermore, we demand that Firth Rixson cease distribution of the enclosed brochure." Id. There is no evidence in the record as to Firth Rixson's response. See deposition of James Laird ("Laird deposition"), p. 192 ("I don't recall [the result of Haynes having sent this letter], specifically. I don't recall specifically, no.").

The alloy that falls within UNS N06022 has been described in articles as: (1) "C-22" and "C-22 alloy" (The Geological Society of America, September 2003) and (2) "C-22" and "622" (Samuel D. Kiser, Special Metals). Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibits 38 and 51. The Geological Society of America article discusses the U.S. Department of Energy's use of the alloy and states "C-22 is a hastelloy made of primarily nickel, chromium, and molybdenum with small amounts of iron, tungsten, and manganese." Id., Exhibit 38. Haynes provided C-22 alloy to the U.S. Department of Energy. Laird deposition, p. 224.

Additionally a December 6, 2000 letter to the U.S. Nuclear Regulatory Commission Chairman from the Chairman of the Advisory Committee on Nuclear Waste, found on the U.S. Nuclear Regulatory Commission's website, lists as the subject "ALLOY C-22 CORROSION STUDIES" and discusses "C-22" and "alloy C-22." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 39. Haynes provided data about its C-22 alloy to the U.S. Nuclear Commission. Laird deposition, p. 228.

14

The description of a book published in 2004 titled "The alloy tree" included "Alloy C-22" under "Corrosion resistant nickel alloys." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 6.

A website page from Nanjing University of Chemical Technology (China) dated March 10, 2005 is titled "Alloy C-22 (UNS06022)" and states "[o]ne of the latest developed improved Alloy C materials is Alloy C-22 (Hastelloy C-22)." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 18.

An article in Volume 17A of Metallurgical Transaction A (November 1986) was entitled "The Welding Metallurgy of HASTELLOY Alloys C-4, C-22, and C-276." Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibit 29. The article states that "HASTELLOY is a trademark of Cabot Corporation." Id.

An article in Volume 17A of Metallurgical Transaction A (December 1986) was entitled "The Use of New PHACOMP in Understanding the Solidification Microstructure of Nickel Base Alloy Weld Metal." Id., Exhibit 30. The article discusses "[t]he weld metal microstructures of five commercial nickel base alloys (HASTELLOYS* C-4, C-22, and C-276, and INCONELS* 625 and 718," and explains that "HASTELLOY is a trademark of Cabot Corporation" and "INCONEL is a trademark of the INCO family of companies." Id.

An article in Volume 10, Number 1 of Molybdenum Mosaic, The Journal of Molybdenum Technology (1987), published by AMAX Metal Products, discussed "Hastelloy alloy C-22" and "alloy C-22." Documents Referenced in Plaintiff's Opposition to Defendant's Motion to Strike the Third Declaration of Paul Manning, Exhibit 1.

15

A Nuvonyx Inc.'s website page dated March 10, 2005 contained an article indicating that Nuvonyx Incorporated performed laser cladding with a pre-placed "C22" powder. Id., Exhibit 36.

Mark Lewis, a sales manager for Melt Products for Electralloy, testified that as a result of this lawsuit, he knows that C-22 is a Haynes alloy and so, if someone asked for a C-22 flat rolled bar, he would tell them to call Haynes directly. Lewis deposition, pp. 18-19.

**B. Evidence of record relevant to Electralloy and its alloy products.**

Defendant Electralloy has been manufacturing an alloy it calls "EC22" since approximately 2002. Deposition of Tracy Rudolph ("Rudolph deposition"), p. 13. Electralloy calls its EC22 product "EC22" due to the 22% chromium content and as an extension of its family of "EC__" designations, designations which Electralloy has been using since the 1970s. Deposition of Mark Lewis ("Lewis deposition"), p. 66. Electralloy sells its EC22 alloy in coil rod, ingot, and weld wire form. It has sold this EC22 alloy to Enpar, Arcos, Sandvik, Corrosion Materials, and A-1 Wire, a division of Special Metals.

Electralloy produces EC22 upon request and order from a customer. Electralloy maintains a capabilities sheet wherein it lists alloys it can make, including EC22. It also has a specification sheet for EC22. These documents can be found on and downloaded from Electralloy's company website.

Electralloy is owned by G.O. Carlson, Inc. Rudolph deposition, p. 5. Electralloy is a division of G.O. Carlson. Id. The plate division of G.O. Carlson manufactured an alloy product called "GOC22." Lewis deposition, p. 71. GOC22 has the same composition as EC22, but was sold only in plate form. Weaver deposition, p. 38.

16

On July 25, 2004, Haynes employee Harry Flower accessed Electralloy's website and saw that Electralloy listed on its website that it had available for sale C22. Deposition of Harry Flower ("Flower deposition"), p. 44. He contacted Electralloy and was told by Wayne Weaver that it would be changed. Id. at pp. 45-46. Weaver testified that the reference to C22 on Electralloy's website was an error which was corrected. Weaver deposition, p. 41-42. Flower again accessed Electralloy's website on August 30, 2005, and again saw that Electralloy listed on its website that it had available for sale C22. Id. at p. 46.

Declarations by Ulrich Trenkmann ("Trenkmann") and Harry Wehr ("Wehr"), customers of Electralloy, are part of the record. See Defendant's Concise Statement of Material Facts in Support of Summary Judgment, Exhibits 41 and 42. Ulrich Trenkmann is the Managing Director of Enpar, which specializes in the distribution, fabrication, and manufacture of semi-finished specialty metal alloy products. Id. at Exhibit 41, ¶ 2. As a result of his position, Trenkmann is "knowledgeable of Enpar's purchase of materials used to make its products." Id. at ¶ 3. "Enpar has purchased on numerous occasions alloy meeting the chemical composition specifications associated with UNS N06022 from Electralloy. Electralloy classifies this alloy as EC-22." Id. at ¶ 5. "When Enpar purchases alloy meeting UNS N06022 specifications from Electralloy it contacts Electralloy to obtain quotes and information regarding availability of the product and price. If Electralloy can produce the product for Enpar, Enpar then submits a purchase order requesting EC-22, UNS N06022, or C-22 alloy." Id. Enpar uses these designations interchangeably because they connote alloy with the chemical composition meeting UNS N06022 specifications." Id. at ¶ 7.

17

Harry Wehr is the Director of Quality Systems at Arcos Industries ("Arcos"), a company that "manufactures a complete line of welding consumables and thermal spray materials in stainless steel, nickel, and copper nickel alloys." Id. at Exhibit 42, ¶ 2. Wehr "is responsible for Arcos' purchase of materials used to make its products." Id. at ¶ 3. "Arcos is a customer of Electralloy and has purchased materials from Electralloy on numerous occasions," including "an alloy meeting UNS N06022 specifications." Id. at ¶¶ 4-5. "Electralloy classifies this alloy as EC22." Id. at ¶ 5. "When purchasing UNS N06022 alloy from Electralloy or others, Arcos requests on the purchase order 622, 22, EC22, UNS N06022, C22, or C-22. It is common in the special metals industry to refer to UNS N06022 alloy as 622, EC22, UNSN06022, C22, or C-22." Id. at ¶ 7.

Electralloy documents relevant to a purchase made from it by Enpar, dated January 27, 2004 and January 28, 2004, repeatedly described the product it was selling to Enpar as "Type C22 Bar." See Exhibit Q to Plaintiff's Motion for Partial Summary Judgment.

## III. Legal Analysis.

### A. Viability of a claim with respect to Electralloy's GOC22 label.

As a preliminary matter, Electralloy attacks Haynes' ability to bring its claims against Electralloy with respect to Electralloy's use of a GOC22 label (as opposed to C22 and EC22). First, Electralloy contends that "'GOC' obviously stands for 'G.O, Carlson,' and . . . the '22' portions of Plaintiff's mark has been disclaimed by Plaintiff and continues to be widely used by numerous others." Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's Opposition Brief"), p. 12. Electralloy further argues that Haynes may not raise this claim against Electralloy at this point in the litigation since Haynes

18

failed to plead any such claim against Electralloy in the Complaint or to make any requests relevant to Electralloy's use of the GOC22 label. Id., p. 12, n. 6.

In response, Haynes cites to its prayer for relief in counts 1 and 2 of the Complaint wherein it requested: "(b) That ELECTRALLOY be enjo[in]ed and restrained from the manufacture, sale and offer for sale of any alloy product under the trademarks 'C-22 and/or EC22' or any colorable variations thereof." Haynes argues that it learned of Electralloy's use of GOC22 during discovery and "GOC22 is clearly a colorable variation of C22 and EC22." Plaintiff's Brief in Reply to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment on Counts 1 and 2 of Its Complaint ("Plaintiff's Reply Brief").

We find that Haynes' Complaint satisfies Fed.R.Civ.P. 8(a)'s requirements of notice pleading such that we will consider Plaintiff's arguments with respect to Electralloy's use of GCO22. We further find with respect to Electralloy's arguments that "'GOC' obviously stands for 'G.O, Carlson,' and . . . the '22' portions of Plaintiff's mark has been disclaimed by Plaintiff and continues to be widely used by numerous others," that genuine issues of material fact exist concerning the GOC22 mark. Therefore, Defendant's motion for summary judgment is denied with respect to its use of GOC22.

**B. Electralloy's contention that it does not use a C22 mark.**

Electralloy also contends that Haynes' motion for summary judgment should be denied with respect to its use of a C22 mark because "[it] does not even use C22" and never made a sale of a C22 product. Defendant's Opposition Brief, 12.

19

Ulrich Trenckmann, Managing Director of Enpar, submitted a Declaration wherein he explains that when Enpar submits a purchase order to Electralloy for a chemical composition meeting UNS N06022 specifications, it will request "EC-22, UNS N06022, or C-22 alloy" because all of these designations are interchangeable and connote such an alloy, see Trenckmann Declaration, ¶ 7. Wayne Weaver, an Electralloy employee, testified that the reference to C22 on Electralloy's website was an error which was corrected.

To the contrary, Haynes employee Harry Flower testified that on July 25, 2004, he accessed Electralloy's website and saw that Electralloy listed on its website that it had available for sale C22. Flower deposition, p. 44. He again accessed Electralloy's website on August 30, 2005, and saw that Electralloy listed on its website that it had available for sale C22. Id. at p. 46. In support of this testimony, Haynes produced two printouts from Electralloy's website dated July 15, 2004 and August 30, 2005, where products labeled as C22 were referenced. See Exs. B and J in support of Plaintiff's Motion for Partial Summary Judgment. Haynes also came forward with "Material Certification Report and Certificate of Quality Conformance" reports dated January 27, 2004 and January 28, 2004, with respect to a purchase from Electralloy by Enpar wherein Electralloy repeatedly described the product it was selling to Enpar as "Type C22 Bar." See Exhibit Q to Plaintiff's Motion for Partial Summary Judgment.

We find that the above described testimony of Haynes employee Harry Flower, the two printouts from Electralloy's website dated July 15, 2004 and August 30, 2005, where products labeled as C22 were referenced, as well as the "Material Certification Report and Certificate of Quality Conformance" reports produced by Haynes wherein Electralloy lists the product it was supplying Enpar as "Type C22 bar," creates a genuine issue of material fact as to whether

20

Electralloy uses or used the mark C22 and whether it ever sold any products under the C22 mark. Defendant's motion for summary judgment on Plaintiff's claims against Defendant related to Defendant's alleged use of a C22 mark on the grounds that Defendant never used C22 and never sold any products under the C22 mark is denied.

## C. Haynes' federal trademark infringement and unfair competition and false designation of origin claims.

Haynes moves this Court to find that Electralloy's use of C22, EC22 and GOC22 infringes Haynes' United States Trademark Registration No. 1,953,864 for "C-22" in violation of the Lanham Act, 15 U.S.C. § 1114, and that Electralloy's use of C22, EC22 and GOC22 in connection with the sale of alloy products constitutes unfair competition and false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) such that summary judgment should be granted in its favor on Counts I and II of its Complaint. Plaintiff's Motion for Partial Summary Judgment, p. 1.

To the contrary, Electralloy moves for summary judgment on Haynes' trademark infringement, unfair competition, and false designation of origin claims on the grounds that as a matter of law, Haynes' C-22 mark is generic and unprotectable. Defendant's Motion for Summary Judgment, p. 1.

The Third Circuit court explained in E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185 (3d Cir. 2008): "[t]o establish trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, a plaintiff must prove that (1) the mark is valid and legally protectable, (2) it owns the mark, and (3) the defendant's use of the mark is likely to create confusion concerning the origin of goods or services." Id. at 191, citing, Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 469-70 (3d Cir. 2005). These same elements must be established to

21

prove Haynes' federal unfair competition and false designation of origin claim. See A&H

Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000) ("[w]e

measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15

U.S.C. § 1125(a)(1)(A), by identical standards.").

### 1. Whether C-22 is valid and legally protectable.

We address first the issue of whether Haynes' C-22 mark is valid and legally protectable.

In arguing that C-22 is a valid, legally protectable trademark, Haynes cites to section 7(b) of the

Lanham Act, 15 U.S.C. § 1057(b), and argues that "Haynes' Certificate of Registration for C-22

demonstrates that Haynes has a valid and legally protectable mark. . . ." Plaintiff's Brief in

Support of Motion for Partial Summary Judgment ) ("Plaintiff's Supporting Brief"), p. 15. 15

U.S.C. § 1057(b) is titled "[c]ertificate as prima facie evidence," and states:

> [a] certificate of registration of a mark upon the principal register provided by this
> chapter shall be prima facie evidence of the validity of the registered mark and of
> the registration of the mark, of the registrant's ownership of the mark, and of the
> registrant's exclusive right to use the registered mark in commerce on or in
> connection with the goods or services specified in the certificate, subject to any
> conditions or limitations stated in the certificate.

Id.

To the contrary, Electralloy argues that Haynes is unable as a matter of law to prove that

C-22 is a valid and legally protectable mark because C-22 has become a generic term in the

specialty metals industry used to identify a corrosion-resistant alloy satisfying UNS N06022

specifications and containing approximately 22% chronium. Defendant's Memorandum of Law

in Opposition to Plaintiff's Motion for Partial Summary Judgment on Counts I and II of its

Complaint ("Defendant's Opposition Brief"), p. 10.

22

Haynes has produced a certificate of registration for the service mark "C-22." See

Plaintiff's Motion for Partial Summary Judgment, Exhibit A. Accordingly, Haynes has provided

*prima facie* proof that its C-22 mark is valid and legally protectable.

This presumption, however, is rebuttable. Electralloy can overcome the statutory

presumption that the C-22 mark is valid and legally protectable by establishing the generic nature

of the mark. In the E.T. Browne Drug Co. decision the Third Circuit court explained:

> [t]erms asserted as trademarks may fall in four categories:
>
> [1] arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; [2] suggestive terms, which suggest rather than describe the characteristics of the goods; [3] descriptive terms, which describe a characteristic or ingredient of the article to which it refers [;] and [4] generic terms, which function as the common descriptive name of a product class. The Lanham Act protects only some of these categories of terms. Working backward, it provides no protection for generic terms because a first-user of a term "cannot deprive competing manufacturers of the product of the right to call an article by its name." In contrast, the Lanham Act protects descriptive terms if they have acquired secondary meaning associating the term with the claimant. Finally, trademark law protects suggestive and arbitrary or fanciful terms without any showing of secondary meaning.

Id. at 191 (internal citations omitted).

Whether C-22 is generic is a question of fact. Id. at 192. The proper test for evaluating

whether C-22 is generic and thus, not protectable under the Lanham Act, is the primary

significance test. Id. The primary significance test:

> inquires whether the primary significance of a term in the minds of the consuming public is the product or the producer." We ask "whether consumers think the term represents the generic name of the product [or service] or a mark indicating merely one source of that product [or service]." If the term refers to the product (i.e., the genus), the term is generic. If, on the other hand, it refers to one source or producer of that product, the term is not generic (i.e., it is descriptive, suggestive, or arbitrary or fanciful). To give an example, "Cola" is generic because it refers to a product, whereas "Pepsi Cola" is not generic because it refers to the producer.

Id. (internal citations and quotations omitted). Moreover, the term under dispute "should be 'evaluated by examining its meaning to the relevant consuming public' [and t]hat evaluation requires looking at the mark as a whole, not dissecting it into various parts." Id. at 194-195 (internal citation and quotation omitted). Additionally:

> [h]aving established that the primary significance test must be used to evaluate the genericness of a term under the Lanham Act, it is important to discuss what kinds of evidence will be helpful in determining what a phrase means to the relevant consuming public. Generally, the relevant sources of information are numerous. "Evidence of the public's understanding of the term [at issue] may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications." However, direct consumer evidence, e.g., consumer surveys and testimony is preferable to indirect forms of evidence. "Consumer surveys have become almost de rigueur in litigation over genericness".

Berner Intern. Corp. v. Mars Sales Co., 987 F.2d 975, 982 (3d Cir. 1993) (internal citations omitted).

In support of its contention that C-22 has become generic, Electralloy has submitted declarations from Ulrich Trenkmann of Enpar and Harry Wehr of Arcos. Relevant to this issue, Trenkmann stated:

> When Enpar purchases alloy meeting UNS N06022 specifications from Electralloy it contacts Electralloy to obtain quotes and information regarding availability of the product and price. If Electralloy can produce the product for Enpar, Enpar then submits a purchase order requesting EC-22, UNS N06022, or C-22 alloy. Enpar uses these designations interchangeably because they connote alloy with the chemical composition meeting UNS N06022 specifications.

Trenkmann Declaration, ¶ 7. Similarly, Wehr stated "[w]hen purchasing UNS N06022 alloy from Electralloy or others, Arcos requests on the purchase order 622, 22, EC22, UNS N06022, C22, or C-22. It is common in the special metals industry to refer to UNS N06022 alloy as 622, EC22, UNSN06022, C22, or C-22." Wehr Declaration, ¶ 7.

24

Electralloy also cited to numerous documents wherein third parties describe an alloy that

meets the specifications of UNS N06022 as "Alloy C22," "C22, Alloy," "Alloy C-22," "Alloy C-

22/UNS NO6022" and "Nickelvac® C22(UNS-N06022)." See Defendant's Concise Statement

of Material Facts in Support of Summary Judgment, Exhibits 4, 5, 6, 16, 17, 19, 20, 21, 22, 23,

24, 25, 26, 27, 33, 36, 37, 38, 39, and 51.

Electralloy also argues that Haynes failed to police its C-22 trademark until recently and

that Haynes' Cease and Desist correspondence supports the conclusion that C-22 has become a

generic term. "The very fact that Plaintiff needed to send so many letters proves that C-22 does

not function as a trademark." Defendant's Reply Brief in Further Support of its Motion for

Summary Judgment ("Defendant's Reply Brief"), pp. 4-6.

Finally, Electralloy argues that Haynes' own use of C-22 to describe its product prior to

its registering C-22 as a trademark is evidence of the generic nature of C-22. Id. at p. 4-5.

In response to Electralloy's arguments as to why C-22 is a generic term, Haynes contends:

Defendant bears the burden of proof on the issue of C-22 allegedly being generic.
. . . The absence of any non-contested third party use, the fact that no competitor
of Haynes uses C-22 in the United States, and the fact that third parties have
recognized C-22 as a registered trademark of Haynes International demonstrates
that the statutory presumption that C-22 is a valid trademark has not and cannot be
overcome.

Plaintiff's Response to Defendant's Surreply Brief in Opposition to Plaintiff's Motion for Partial

Summary Judgment, pp. 1-2.

Because the burden is on Electralloy to establish that Haynes' C-22 mark is generic, we

apply the primary significance test to the facts of this case viewed in a light most favorable to

Haynes. Reviewing the evidence of record, including, but not limited to the following evidence,

we find that the evidence of record creates a genuine issue of material fact as to whether

25

consumers think the term C-22 represents the generic name of an alloy meeting the specifications of UNS N06022 or whether it indicates one source of that product, Haynes. First, the fact that some of Haynes' customers use the description "Hastelloy® C-22" reasonably could be interpreted to mean that they associate C-22 with Haynes. Second the willingness of all but one of Haynes' customers to correct their literature to indicate that C-22 is a registered trademark of Haynes reasonably could be interpreted to mean that they understand C-22 to refer to Haynes. Third, and most significantly, the use of non-"C-22" names by other manufacturers of alloy products that meet the specification of UNS N06022, for example Krupp VDM (which uses Nicrofer® 5621hMoW or 622), Special Metals (which uses Inconel® Alloy 22), Cartech (which uses Carpenter Alloy 22), Allegheny (which uses AL 22), and Bohler (which uses L328), is suggestive of the fact that C-22 is not a generic term, as is the use of "Alloy 22" by Arcos, a reseller which buys alloy product within UNS N06022 from manufacturers other than Haynes, to describe the alloy product it resells. As such, we cannot conclude that there is sufficient evidence of genericness to overcome the statutory presumption that Haynes' registered C-22 mark is valid and protectable. Defendant's motion for summary judgment on the basis that C-22 is a generic term is denied.

## 2. Whether there is a likelihood of confusion between the parties' marks.

Turning next to the likelihood of confusion element of Haynes' trademark infringement and unfair competition/false designation of origin claims, Haynes contends that there is no genuine issue of material fact and judgment must be entered as a matter of law in its favor on these claims because the undisputed evidence of record shows:

26

Defendant is using a virtually identical designation C22 and other designations which fully incorporate Haynes' federally registered mark C-22, namely EC22 and GOC22, for the same product as Haynes sells under its registered trademark C-22. Defendant advertises the product using the same media as Haynes, namely web pages and product brochures. Customers and potential customers for Haynes' C-22 alloy are the customers and potential customers for Defendant's alloy. These similarities establish a likelihood of confusion.

Plaintiff's Supporting Brief, p. 17. In its Reply Brief, Haynes further argues that its C-22

trademark is strong for the following reasons:

[t]he facts relevant to the strength of Plaintiff's mark which are not in dispute are as follows. Plaintiff owns an incontestable trademark registration. Plaintiff has spent nearly $10,000.00 per year in advertising directed specifically to products sold under its C-22 trademark, and about $40,000 of its total annual marketing expenses applies to promoting C-22 alloy. Such advertising is directed towards the relative market. Plaintiff has sent numerous letters to customers and competitors regarding their misuse of the C-22 mark. Those customers and competitors of Plaintiff have recognized and respected Plaintiff's trademark rights in its C-22 trademark. It is clear from this uncontradicted evidence submitted by Plaintiff that C-22 is a strong mark and that the factor weights [sic] in favor of Plaintiff.

Plaintiff's Reply Brief, p. 12.

To the contrary, Electralloy contends that it is entitled to summary judgment on these

claims because "[e]ven if Haynes were able to show that C-22 is valid and protectable, its

trademark infringement claims would still fail because it cannot present evidence of a likelihood

of confusion among the relevant consumers." Defendant's Supporting Brief, p. 7. More

specifically, Electralloy argues: (1) the parties' marks are dissimilar; (2) the dissimilarities

between the parties' marks make confusion unlikely; (3) C-22 is a weak mark; (4) the

sophistication of the parties' consumers, the lengthy and detailed inquiries the consumers make

prior to purchasing the alloy products, and the cost of the products make confusion of the parties'

goods unlikely; (5) there is no evidence of actual confusion between the parties' goods; (6)

27

Electralloy sells very little of its EC22 product and does not advertise the alloy product ; (7) Haynes has not presented any evidence of bad faith; and (8) "the fact that EC22 and C-22 have coexisted for numerous years without confusion is a strong indicator that confusion between the parties' respective designations is unlikely." Defendant's Opposition Brief, pp. 12-23.

To prove trademark infringement/unfair competition under § 43(a) of the Lanham Act, a plaintiff must show, *inter alia,* that the use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. 15 U.S.C. 1125(a); Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990); A & H Sportswear, Inc. v. Victoria Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000). A likelihood of confusion exists "when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978). Ordinarily, likelihood of confusion is a factual issue. Green v. Fornario, 486 F.3d 100, 106 (3d Cir. 2007), citing, A&H Sportswear, Inc., 237 F.3d at 207.

With respect to the likelihood of confusion issue, the Third Circuit Court of Appeals has identified ten factors to be used in balancing whether the likelihood of confusion exists. See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983); Scott Paper Co., 589 F.2d at 1229. These so-called Lapp factors are as follows: (1) the strength of the owner's mark; (2) the similarity of the two marks; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time Haynes used its mark without evidence of confusion; (5) Electralloy's intent in adopting the mark; (6) any evidence of actual confusion; (7) whether the goods are marketed through the same channels of

28

trade and advertised in the same media; (8) the extent to which the parties' sales targets are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market. Lapp, 721 F.2d at 463; Scott Paper Co., 589 F.2d at 1229. Notably, "the Lapp test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005). "As the analysis is highly fact-intensive, 'summary judgment for either party is unlikely, absent a particularly one-sided factual record on the issue'." BabyAge.com, Inc. v. Leachco, Inc., 2009 WL 82552, *8 (M.D. Pa. January 12, 2009), citing, 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F.Supp.2d 273, 285 (D.N.J. 2006).

   With respect to the first Lapp factor:

   [c]ourts have recognized that

   '[a] strong trademark is ... one that carries widespread, immediate recognition that
   one producer (even if unknown) is associated with the mark, and so with the
   product. If a second comer adopts a mark substantially identical to a strong mark,
   there is a correspondingly high likelihood that consumers will mistakenly
   associate the newcomer's product with the owner of the strong mark.'

Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 282 (3d Cir. 2001), quoting, Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 203 (3d Cir. 1995). "'The strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition'. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace

29

recognition'." BabyAge.com, Inc., 2009 WL 82552 at *9 (citations omitted).

Here, there are factual disputes about the strength of Haynes' C-22 mark which preclude the Court from determining with sufficient precision the strength of Haynes' C-22 mark in the specialty metals industry. For example, in favor of the defense is the fact that prior to Haynes contacting its customers and competitors, numerous customers and competitors were using C-22 or a variant thereof to describe alloy product available that meet UNS N06022. In Haynes' favor, however, is the fact that with the exception of Corrosion Materials, every customer agreed to remedy their literature to reflect that the C-22 alloy they were selling was C-22®, a registered trademark of Haynes, and competitors changed the name of their marks. What remains open for reasonable interpretation, and thus, creates a genuine issue of material fact, is the motivation of these entities in making the changes insisted upon by Haynes in the cease and desist letters. Accordingly, the Court has not weighed this factor in favor of either party.

Reviewing the evidence of record in light of the remaining Lapp factors, in favor of Haynes' position that there is a likelihood of confusion between Haynes' C-22 mark and Electralloy's marks are that: (1) as stated above, there is evidence of record from which a reasonable jury could conclude that Electralloy has used the following marks: EC22, C22 and GOC22, and these marks are substantially similar to Haynes's C-22 mark;[5] (2) both parties'

---

[5]The Third Circuit court explains "[a]lthough the degree of similarity between the owner's mark and the alleged infringing mark is but one factor in the multi-factor confusion analysis, we have recognized that when products directly compete, mark similarity 'may be the most important of the ten factors in *Lapp*'." Checkpoint Systems, Inc., 269 F.3d at 281, quoting, Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 (3d Cir.1994).

products are alloys that meet the specifications of UNS N06022;[6] (3) Haynes has used C-22 since the 1980's; (4) both parties' goods are marketed through the same channels of trade, the special metals industry; (5) both parties' goods are advertised in the same media in that both advertise their alloy products meeting the specification of UNS 06022 on company websites, and through the use of capabilities sheets/bulletins; (6) the parties' sales targets are the same; and (7) documents created by Electralloy with respect to a purchase of alloy from Electralloy by Enpar dated January 27, 2004 and January 28, 2004, repeatedly described the product it was selling to Enpar as "Type C22 Bar."

To the contrary, in reviewing the Lapp factors, the following evidence supports Electralloy's position that there is not a likelihood of confusion between the parties' marks. First, given the price of the alloys at issue and that the consumers of the parties' alloys are businesses within the specialty metals industry, it is reasonable to expect said purchasers engage in a heightened level of care in evaluating an alloy before purchasing it.[7] Second, while documents created by Electralloy with respect to a purchase of alloy from the Electralloy by Enpar dated January 27, 2004 and January 28, 2004, repeatedly described the product it was selling to Enpar as "Type C22 Bar," Enpar's Managing Director explained that he has never been confused when submitting a purchase order to Electralloy that it was purchasing from a source other than

---

[6]"Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship. The test is whether the goods are similar enough that a customer would assume they were offered by the same source." Checkpoint Systems, Inc., 269 F.3d at 286, citing, Fisons, 30 F.3d at 481; Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988).

[7]"Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." Checkpoint Systems, Inc., 269 F.3d at 284, citing, Versa Products., 50 F.3d at 204.

Electralloy. Third, the Director of Quality Systems of Arcos, an Electralloy customer, explained in making purchases from Electralloy, Arcos has never been confused about the source of the product being purchased. Fourth, Corrosion Materials, a Haynes' customer, explained in response to the letter it received from Haynes indicating that it was not properly using Haynes' C-22 trademark: "[w]hile we do continue to stock and sell . . . Hastelloy® C-22®, we do indeed stock materials from other manufacturers. We never misrepresented our stock offering and always advise any customer specifying Hastelloy® that we are offering an alternate to Hastelloy when that is the case." Fifth, while two printouts from Electralloy's website dated July 15, 2004 and August 30, 2005, refer to products labeled as "C22," Electralloy employee Wayne Weaver explained that this was an error which was corrected. Sixth, while both parties' goods are advertised in the same media in that both advertise their alloy products meeting the specification of UNS 06022 on company websites, and in capabilities sheets/bulletins, Electralloy does not actively solicit orders for its product; it makes the alloy product only in response to an inquiry. Finally, there is no evidence, direct or circumstantial, that Electralloy intentionally or willfully adopted its marks with Haynes' C-22 mark in mind; Electralloy uses "EC" as part of the name of several of its alloy products, not just its EC22 alloy.

In the end, after balancing the Lapp factors against each other in a qualitative inquiry, we find that the evidence of record is not so one-sided either for Haynes or for Electralloy that we can find as a matter of law that there is, or is not, a likelihood of confusion between the parties' products. As such, both parties' motions for summary judgment with respect to Plaintiff's trademark infringement and unfair competition/false designation of origin claims are denied.

32

**D. Haynes' trademark dilution claims.**

While Haynes did not seek summary judgment in its favor on Counts IV and V of its Complaint, Electralloy seeks summary judgment in its favor on both of these counts. Count IV alleges trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Count V alleges trademark dilution under Pennsylvania's anti-dilution law, 54 Pa.C.S.A. § 1124.

Initially, effective October 6, 2006, a date after this lawsuit was filed, Congress enacted the Trademark Dilution Revision Act of 2006 ("the TDRA"), which struck in its entirety the Federal Trademark Dilution Act of 1996 ("the FTDA), the federal dilution statute in existence at the time this lawsuit was filed. The issue of the effect of the TDRA on pending cases such as this one is significant in that the TDRA changes the definition of dilution, the definition of a famous mark, and the standard for deciding cases (from actual dilution to likelihood of dilution). David S. Welkowitz, Trademark Dilution (2008 Cumulative Supplement), p. 270.

We find that to the extent Haynes seeks prospective, injunctive relief for any such dilution by Electralloy, the TDRA is applicable. See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (concluding that the TDRA "applies to this case to the extent that [the plaintiff] has sought injunctive relief on the issue of dilution"). To the extent, however, that Haynes seeks monetary damages for any past dilution of its C-22 mark by Electralloy, the FTDA remains applicable to Haynes' trademark dilution claim.

**1. Trademark Dilution Revision Act of 2006.**

Turning first to Haynes' claim for injunctive relief, to establish a violation under the TDRA, a plaintiff must show that: (1) its mark is famous; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the

33

defendant's use is likely to cause dilution by tarnishment or dilution by blurring. Further, with respect to the issue of whether a mark is famous, under the TDRA a mark is only famous for dilution purposes if the mark is "widely recognized by the general consuming public of the United States." 15 U.S.C. § 1125(c)(2). In other words, a mark that is famous only in "niche" markets is not protected under the FDRA. See Componentone, L.L.C. v. Componentart, Inc., 2007 WL 4302108, \*2 (W.D. Pa. Dec. 6, 2007), citing, Milbank Tweed Hadley &McCloy LLP v. Milbank Holding Corp., 82 U.S.P.Q.2d 1583, 1588 (C.D. Ca. Feb. 23, 2007) (same), Dan-Foam A/S v. Brand Named Beds, L.L.C., 2007 WL 1346609, \*6 n. 9. (S.D. N.Y. May 4, 2007) (same). Here, even viewing the evidence in a light most favorable to Haynes, a reasonable fact finder could not conclude that Plaintiff's C-22 mark is widely recognized by the general consuming public of the United States. Indeed, Haynes admits as much in its Opposition Brief when it stated: "Haynes advertising is directed towards its relevant consumer base. In order for Haynes C-22 mark to be famous, Haynes C-22 mark does not have to be advertised in every household in America, but rather can be famous within a particular industry." Plaintiff's Opposition Brief, p. 22. See also id. at 23 ("Haynes should be entitled at trial to prove its case as to whether or not Haynes's C-22 mark has become famous within the relevant purchasing industry.") Accordingly, Defendant's motion for summary judgment on Plaintiff's federal dilution claim, contained in Count IV of Plaintiff's Complaint, is granted with respect for Plaintiff's claim for injunctive relief under federal trademark dilution law.

**2. FTDA and state law trade dilution claim.**

Federal FTDA claims and Pennsylvania state law trade dilution claims are established similarly. See Just Enterprises, Inc. v. O'Malley & Langan, P.C., 560 F.Supp.2d 345 (M.D. Pa.

34

.

2008), quoting, Scott Fetzer Co. v. Gehring, 288 F.Supp.2d 696, 701 n. 7 (E.D.Pa. 2003)

(explaining "[c]ourts have noted that in terms of federal law and Pennsylvania law on trademark

dilution and infringement, 'the federal statute and the state laws are identical except that the

Pennsylvania law narrows the focus to acts within the Commonwealth'.").

In Times Mirror Magazines, Inc. v. Las Vegas Sports News L.L.C, 212 F.3d 157 (3d Cir.

2000), the appellate court explained:

[t]o establish a *prima facie* claim for relief under the [FTDA], the plaintiff must
plead and prove:

1. The plaintiff is the owner of a mark that qualifies as a "famous"
mark in light of the totality of the eight factors listed in
§1125(c)(1),
2. The defendant is making commercial use in interstate commerce
of a mark or trade name,
3. The defendant's use began after the plaintiff's mark became
famous, and
4. The defendant's use causes dilution by lessening the capacity of
the plaintiff's mark to identify and distinguish goods or services.

*See* 4 McCarthy, *supra*, § 24:89; *see also Hershey Foods Corp. v. Mars, Inc.*, 998
F.Supp. 500, 504 (M.D.Pa.1998) (quoting 4 McCarthy, *supra*).

Id. at 163.

Electralloy argues that "Haynes' FTDA claim fails for three reasons: (1) the parties'

respective marks are not sufficiently similar; (2) the C-22 mark has not achieved the requisite

level of distinction and fame; and (3) Electralloy's use of EC22 has not caused and will not cause

actual dilution." Defendant's Supporting Brief, p. 25. In response, Haynes argues that "there is a

dispute of material facts as to whether C-22 is distinctive or well-known and whether there has

been actual dilution." Plaintiff's Brief in Opposition to Defendant's Motion for Summary

Judgment, p. 2.

35

### a. Similarity of parties' marks.

Electralloy contends that the parties' marks are not sufficiently similar because:(1) the two marks only superficially resemble each other; and (2) when the marks are viewed in the commercial context, Electralloy's EC22 mark inevitably appears in conjunction with "Electralloy" while Haynes' C-22 mark is invariably juxtaposed with "Hastelloy." Defendant's Supporting Brief, p. 26.

In response, Haynes first argues that "[t]he designations used by Electralloy are C22, EC22 and GOC22[;] all use the exact same letter and number combination in the exact s[a]me order." Plaintiff's Opposition Brief, p. 21. Haynes also argues that it does not, as argued by the defense, always juxtapose its C-22 mark with the name and mark "Hastelloy" and cites to documents in the record wherein Plaintiff's product is referred to as "Alloy C-22" and "C-22" without "Hastelloy." Id.

Viewing the evidence of record in a light most favorable to Haynes as the non-moving party, including the documents cited by Haynes wherein "Hastelloy" was not juxtaposed with Plaintiff's C-22 mark, we find that a reasonable fact finder could conclude that Electralloy's C22, EC22, and GOC22 marks are substantially similar to Plaintiff's C-22 mark. See Playtex Products, Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 167 (2d Cir. 2004), citing, Federal Exp. Corp. v. Federal Espresso, Inc., 201 F.3d 168, 176 (2d Cir.2000) ("[a] plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are "very" or "substantially similar.") (citation and internal quotation marks omitted).

### b. Famousness of C-22 mark.

We turn next to the issue of whether Haynes is the owner of a mark that qualifies as a

"famous" mark in light of the totality of the eight non-exclusive factors listed in 15 U.S.C.

§ 1125(c)(1). These eight non-exclusive factors are:

(A) the degree of inherent or acquired distinctiveness of the mark;
(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
(D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods and services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
(G) the nature and extent of use of the same or similar marks by third parties; and
(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1)(A)-(H).

In support of its position that its C-22 mark is famous, Haynes first argues that C-22 is

not a generic term, but rather, the mark is distinctive. Plaintiff's Opposition Brief, p. 21. In

support of its position that C-22 does not serve as the common term used in the specialty industry

to describe a metal within UNS No. N06022 and that its C-22 trademark is recognized in the

relevant channels of trade and thus is distinctive, Haynes cites to the Cease and Desist

Correspondence, wherein Plaintiff's exclusive right to use C-22 was acknowledged by almost all

said purchasers/resellers and competitors. Id.

Haynes further argues that it has used the C-22 mark for more than 20 years, since 1984,

and that its use of C-22 has been virtually exclusive during that time period given that Haynes

held a patent on its C-22 alloy from 1985 until 2002. Id. at p. 22. Haynes next argues that the

"[m]arketing and advertising of products sold under the C-22 trademark to the relevant

37

purchasers and potential purchasers are . . . significant." Id. In support this last contention, Haynes states that it has created brochures specifically directed to its C-22 alloy, has advertised in trade publications, had a booth at several trade shows, has presented technical papers at industry conferences, has created brochures and a website that features all of its alloys, including the C-22 alloy, and has advertised and marketed 36 alloys over the past six years with the average of its annual advertising and marketing expenses during the past six years being $1,440,000.00, of which this Court should allocate $40,000 annually to the marketing and advertising of C-22 given that C-22 is and has been for the past 6 years one of Plaintiff's top 10 selling alloys. Finally, in support of its position that its C-22 mark is famous, Haynes also contends that at his deposition Mark Lewis, Electralloy's Sales Manager for Melt Products, "testified when asked with whom he associates C-22, that 'C-22 is a Haynes alloy'." Id. at p. 23.

Prior to the enactment of the TDRA, the Third Circuit Court had held that "[w]e are persuaded that a mark not famous to the general public is nevertheless entitled to protection from dilution where both the plaintiff and defendant are operating in the same or related markets, so long as the plaintiff's mark possesses a high degree of fame in its niche market." Times Mirror Magazines, Inc., 212 F.3d at 164. This conclusion is consistent with the general proposition that trademark dilution claims are reserved for only the strongest marks. See Welkowitz, Trademark Dilution (2002), p. 177 ("it is only those few marks that can establish their 'claim to fame' that may use the protections of the FTDA. All other marks, even those deemed 'strong' can only be protected by ordinary confusion-based infringement claims.").

Applying the non-exclusive § 1125 (c) factors to the evidence of record viewed in a light most favorable to Haynes, we find as follows. First, with respect to the distinctiveness of the C-

22 mark, we find that for the reasons set forth above with respect to the issue of whether Haynes'

C-22 mark is generic and whether there is a likelihood of confusion between the parties' marks,

there are genuine issues of material fact which preclude the court from being able to conclusively

define the degree of C-22's distinctiveness.

Second, as to "the duration and extent of use of the mark in connection with the goods or

services with which the mark is used," it is undisputed that Haynes has been using its C-22 mark

since the 1980's and always uses the mark to indicate its goods within UNS NO06022.

Third, with respect to "the duration and extent of advertising and publicity of the mark,"

Haynes has advertised and publicized its C-22 mark since it was introduced in the 1980's. More

specifically, since its introduction, Haynes has advertised and promoted its C-22 alloy in

brochures, at a cost of approximately $10,000 a year. Haynes also has advertised and promoted

its C-22 alloy in industry publications, on its website, and at approximately 6 to 8 trade shows

per year. Employees of Haynes also have written more than 25 technical papers describing the

uses of and tests conducted on Plaintiff's C-22 alloy. Further, Haynes distributes these technical

papers at various trade shows. Finally, the average of Haynes' annual advertising and marketing

expenses during the six years prior to October 19, 2005, was $1,440,000, with most of those

expenses including the advertising/marketing of its C-22 alloy. Third Manning Declaration, ¶15.

With respect to "the geographical extent of the trading area in which the mark is used"

and "the channels of trade for the goods and services with which the mark is used," it is

undisputed that Haynes sells its C-22 alloy products throughout the United States and

internationally and that Plaintiff's C-22 mark is used in the specialty metals industry. Similarly,

as to "whether the mark was registered under the Act of March 3, 1881, or the Act of February

20, 1905, or on the principal register," it is undisputed that Plaintiff's C-22 mark is registered in the United States Patent and Trademark Office.

Turning next to "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought," viewing the evidence in a light most favorable to Haynes as the non-moving party, it is true, as Haynes argues, that in response to Haynes' "cease and desist" letters, almost all of the purchasers and competitors which received the letters acknowledged Haynes' exclusive right to use C-22 and either eliminated their use of C-22 or agreed to acknowledge that C-22 was a registered trademark of Haynes.

Finally, with respect to "the nature and extent of use of the same or similar marks by third parties," even viewing the evidence of record in a light most favorable to Haynes as the non-moving party, the Cease and Desist Correspondence shows that prior to Haynes sending out the "cease and desist" letters, numerous others in the specialty metals industry used descriptions similar to Plaintiff's C-22 mark to describe alloy compositions that fall within UNS N06022. Moreover, after Haynes' "cease and desist" letters were sent out and competitors agreed to rename their products that met the specifications of UNS N06022, the new names of the products remain similar to Plaintiff's C-22 mark. For example, Special Metals now uses "Inconel Alloy 22," Cartech now uses "Carpenter Alloy 22," Allegheny now uses "AL22" and Corrosion Materials now uses "Alloy 22."

Taking all of this evidence of record into account and viewing it in a light most favorable to Haynes as the non-moving party, we find that the evidence of record creates a genuine issue of material fact as to whether Plaintiff's C-22 mark is famous within its niche market and thus

40

.

entitled to protection under the FTDA and Pennsylvania state law. Defendant's motion for

summary judgment cannot be granted on Counts IV and V of Plaintiff's Complaint on this basis.

**c. Actual dilution.**

Electralloy's final argument is that Haynes' dilution claim must fail as a matter of law

because Haynes has not presented and cannot present any evidence to support a claim of actual

dilution. Defendant's Supporting Brief, p. 30.

In response, Haynes contends:

[t]he evidence of record clearly shows that Electralloy used C22. In addition,
Electralloy has received purchase orders for C22 or C-22 and has filled it with its
own C22, EC22, or GOC22 alloy, rather than an alloy from Haynes. This alone is
evidence that Electralloy's use of its designations has caused dilution of the
distinctive quality of Haynes' C-22 mark. In any event, Haynes should have the
opportunity to present evidence of dilution at trial. Haynes is not obligated to
present its entire case during discovery, but merely to respond to discovery
requests.

Plaintiff's Opposition Brief, p. 24.

In Moseley v. Secret Catalogue, Inc., 537 U.S. 418, 432, 123 S.Ct. 1115, 1124 (2003), the

Court explained:

The term 'dilution' means the lessening of the capacity of a famous mark to
identify and distinguish goods or services, regardless of the presence or absence
of-

(1) competition between the owner of the famous mark and other parties, or

(2) likelihood of confusion, mistake, or deception.'

... [T]hat does not mean that the consequences of dilution, such as an actual loss
of sales or profits, must also be proved.

41

Id. at 432, 123 S.Ct. at 1124, quoting, 15 U.S.C. § 1127. In Times Mirror Magazines, Inc., the

appellate court further explained:

> "Blurring" in this context means "to make dim, indistinct or indefinite." Webster's
> Third New International Dictionary 243 (1968). Blurring occurs when the
> defendant's use of its mark causes the public to no longer associate the plaintiff's
> famous mark with its goods or services; the public instead begins associating both
> the plaintiff and the defendant with the famous mark. *See I.P. Lund*, 163 F.3d at
> 47-48; 4 McCarthy, supra, § 24:70. Dilution by blurring takes place when the
> defendant's use of its mark causes the identifying features of the plaintiff's famous
> mark to become vague and less distinctive. To prove dilution by blurring, the
> owner of a famous mark must prove that the capacity of its mark to continue to be
> strong and famous would be endangered by the defendant's use of its mark. *See* 4
> *McCarthy, supra*, § 29:94.

Times Mirror Magazines, Inc., 212 F.3d at 168.

Turning to the evidence Haynes states supports its position that Electralloy's marks have

actually diluted the C-22 mark, we find that viewing the evidence in a light most favorable to

Haynes, in July 2004 and again in August 2005, a Haynes employee was available to access

Electralloy's website and see that Electralloy listed C22 on its website as an alloy it had available

for sale. With respect to a sale of alloy to Enpar in 2004, Electralloy itself described the product

it was supplying to its customer as "Type C22 bar." Enpar and Arcos executives explained that

when they would place purchase orders with Electralloy for alloy that fell within the

specifications of UNS N06022, the names they used for the alloy requested included "C22" and

"C-22 alloy;" Electralloy would fill these purchase orders with EC22 alloy. Based upon this

evidence, a reasonable fact finder could conclude that Electralloy's use of its marks diluted

Haynes' C-22 mark.

Defendant's motion for summary judgment on Plaintiff's trademark dilution claims must be denied other than with respect to Plaintiff's request for injunctive relief.

**IV. Conclusion.**

Plaintiff's motion for partial summary judgment is denied. Defendant's motion for summary judgment is granted only as to Plaintiff's request for injunctive relief under federal trademark dilution law and is otherwise denied.

An appropriate Order follows.

March 23, 2009

Maurice B. Cohill, Jr.
Senior District Court Judge